178 So.2d 113 (1965)
HOME DEVELOPMENT COMPANY OF ST. PETERSBURG, Inc., and Roy J. Deeb and Marilyn K. Deeb, his wife, Petitioners,
v.
Rudolph BURSANI and Lillian Bursani, Individually and as husband and wife, Respondents.
No. 33242.
Supreme Court of Florida.
July 14, 1965.
Rehearing Denied September 23, 1965.
*114 Kiernan & Reams, St. Petersburg, for petitioners.
Nelson, Beckett & Nelson, St. Petersburg, for respondents.
ROBERTS, Justice.
The cause is again before the court on conflict certiorari, to review a decision of the District Court of Appeal, Second District, 159 So.2d 244, 176 So.2d 100, which had affirmed a decree of the Circuit Court in and for Pinellas County.
This court, feeling that probable jurisdiction had been made to appear, set the cause for oral argument on the questions of jurisdiction and merits. Following the argument we were in doubt as to conflict jurisdiction because we did not have the benefit of an opinion agreed to by the majority of the District Court, and thus released jurisdiction to that court, 168 So.2d 131, inviting it to adopt an opinion setting forth the theory and reasoning upon which its decision had been reached, and posing particularly three questions for consideration, viz.:
"(1) Did the trial court commit error in entering a money judgment in view of the contract which apparently provided for the purchase of certain shares of stock by barter of corporate assets rather than in dollars?
"(2) Did the trial court commit error in entering a money judgment against certain stockholders of the corporation for a corporate obligation when no finding of fraud had been made?
"(3) Did the trial court commit error by including in its calculation of a money judgment a substantial item representing anticipated future profits on certain unsold assets of the corporation, against a contention that the computation of such future profits on the prospective sale of such unsold assets appear, on cursory examination of the Master's report, to be speculative and conjectural and apparently predicated upon past profits of past transactions of the same corporation and in different economic climates?"
The District Court of Appeal in a per curiam order and without an opinion did on June 9, 1965 state as to the three questions above mentioned, "we did consider those questions, answering them in the negative". While the matter was pending in remand with the District Court, this court determined that we do have jurisdiction to review a decision of the District Court of Appeal without opinion where the legal result is such that it creates a conflict with another opinion of this court or with a decision of a different court of appeal. See Foley v. Weaver Drugs, Inc., Fla., 168 So.2d 749. In this posture, we have no alternative but to proceed with our constitutional duty to review the cause. We conclude for the reasons hereinafter stated that in affirming the decree of the lower court, the legal effect was to disregard and conflict with the many decisions of this court  and the universal rule  to the effect that a court is not authorized to rewrite a contract of the parties, and thus we have conflict jurisdiction. These decisions will be referred to in more detail upon the development of *115 the history of the litigation as shown by the record and the facts as found by the special master and stated in his report, which findings of fact were adopted and confirmed by the trial court as the findings and order of that court, thus becoming a part of the record proper.
The history and background are set forth in our opinion remanding the cause to the District Court, appearing in Home Development Co. v. Bursani, Fla., 168 So.2d 131, and a part of which for convenience we now repeat:
"The litigation arose out of a disagreement between the petitioner Deeb and the respondent Bursani, each of whom (with their respective spouses) are the owners and holders of 50 percent of the stock of the petitioner corporation, Home Development Company of St. Petersburg, Inc. This corporation was organized by the parties in 1957 for the purpose of building houses for sale for a profit, the parties having previously engaged in a similar joint venture in the name of a corporation wholly owned by Mr. Deeb. The charter of the newly formed corporation provided, in Article III thereof, for the issuance of 100 shares of common stock and specifically restricted the sale thereof, as follows:
"`* * * the same are to be restricted as to sale, requiring the owner and/or holder of such shares to offer the same in writing to the corporation at book value or market value, whichever shall be higher in dollar value and requiring the corporation to purchase same or to distribute to such stockholder assets of the corporation as purchase price for such stock. The fair market value of such assets as distributed shall be equal to the dollar purchase price of such stock as provided for herein. The corporation shall purchase said stock herewith within thirty days of the offer as provided for herein or the holder thereof may sell the same to any person or take such legal action as may be necessary to enforce this provision.'
"The parties also entered into a stock-purchase agreement, at the time of the formation of the corporation, by which the Bursanis agreed to sell to the corporation, at the request of the Deebs, their shares of stock `in accordance with the procedure set forth in ARTICLE III, Section 1, of the corporation charter;' the Deebs agreed that, at the request of the Bursanis, they would `cause the capital stock of the [Bursanis] to be purchased pursuant to ARTICLE III-Section 1, of the corporation charter;' and the corporation agreed that, at the request of either the Deebs or the Bursanis, it would comply with the provisions of Article III of the charter.
"About a year and a half and some thirty-four houses later, the parties came to a parting of the ways; and, after an exchange of correspondence in which Mr. Bursani's attorney advised Mr. Deeb that he had until December 17, 1959, to make a proposal to purchase the Bursanis' stock, otherwise he would advise Mr. Bursani to bring a stockholder's suit for an accounting etc. to dispose of Mr. Bursani's holdings in the corporation, and a reply by Mr. Deeb's attorney to the effect that the corporation was exercising its stock purchase rights as of December 17, 1959, and would proceed `with all due dispatch' to determine the value of the Bursanis' stock `according to the provisions of the charter', the instant suit was filed by the Deebs and the corporation, as parties plaintiff, against the Bursanis, praying for injunctive relief against the allegedly damaging interference by Mr. Bursani with the corporation's business affairs and `for such further orders as may be required for the enforcement of the contract for *116 the sale by [the Bursanis] of their stock in the plaintiff corporation to the plaintiff corporation.'
"The Bursanis filed an answer and counterclaim, denying the alleged interference, alleging that they were ready and willing to convey their stock to the corporation upon the payment to them of the `actual book value' of the stock after the same was ascertained `after a full and complete accounting', and counterclaiming for amounts allegedly due them on promissory notes of the corporation, the use by the corporation of a truck owned by them, and other items.
"The cause was referred to a Special Master to hear the testimony to `state' an accounting, to make findings of fact and draw conclusions of law, and report the same and his recommendations to the court. Although voluminous testimony was heard by the Master, the salient facts are few. As shown by his report, an independent audit of the corporation's books and records was made, which showed corporate assets  consisting of cash, notes and accounts receivable, contracts for the sale of houses, unsold houses, and vacant lots  having a net worth of $36,882.76 as of December 17, 1959. The unsold houses (nine of them) were shown on the books at cost (some $95,000.00) without a projection of estimated profit.
"Based on this audit, the Deebs offered on behalf of the corporation, as the purchase price of the Bursanis' stock, certain of the contracts for the sale of houses previously sold  having the equivalent in dollar value, according to the brief of the petitioners, of more than one-half of the net worth of the corporation as shown on the books and audits as of December 17, 1959. This offer was declined by the Bursanis  and rightly so, according to the Special Master. The Master found that `in arrogating unto themselves all of the completed but unsold houses and all of the other assets except these contracts for sale, [the Deebs] were under the circumstances basically unfair and inequitable to Mr. and Mrs. Bursani in that Bursani's efforts also aided in the production of these assets'; that the contract `contemplated a distribution of the assets in existence at the time of the exercise of the option to purchase'; that the Deebs and the corporation had breached the stock-purchase agreement; and that the Bursanis were entitled to a money decree for damages `based upon the reasonable value of the assets which they would have received if an equitable distribution of assets had been made in accordance with the contract.'
"He recommended that a money decree be entered against the corporation and the Deebs individually, and impressed as an equitable lien against the corporate assets, in the amount of $34,694.98  being one-half of the net worth of the corporation as shown by the audit mentioned above and one-half of the estimated profit on the nine houses that were unsold on December 17, 1959 (estimated to be $16,118.20 after a 30% tax deduction) and the remainder (some $8,000.00) being sums found to be due and owing to Mr. Bursani on account of the promissory notes and one other item of indebtedness. He recommended that the Bursanis be awarded interest on the amount of the decree at the legal rate of 6% from January 17, 1960, until paid, and that the entire cost of the litigation  including a Master's fee of $1,500.00  be assessed against the Deebs. The Deebs' exceptions to the Master's report were overruled and a decree was entered in accordance with his recommendations (some $40,000.00, which included an award of $6,000.00 as interest from January 1960). As noted, the decree was affirmed upon *117 appeal to the District Court of Appeal, Second District, and review is now sought here by way of conflict certiorari."
No extended discussion is needed to show that, regardless of the equities of the parties, the Master (and the courts in adopting his findings and recommendations) went far beyond permissible limits in interpreting the stock-purchase agreement and Article III of the Charter  assuming that an interpretation was necessary or proper. There was nothing whatsoever in these instruments that could be interpreted as requiring a distribution in kind of each and every asset of the corporation upon a termination of the Bursanis' interest therein. The agreement and charter provision called for the payment to the Bursanis of the market value or the book value, whichever was higher, of the corporate stock; authorized the payment in "assets of the corporation as purchase price for such stock"; and specifically provided that the "fair market value of such assets as distributed shall be equal to the dollar purchase price of such stock as provided for herein." (Emphasis added.)
Thus, in clear and unambiguous terms, the distribution of corporate assets is tied to the "purchase price" of the stock  that is, the market or book value thereof, "whichever shall be higher in dollar value". If the parties had intended that, upon the termination of Mr. Bursani's association with the corporation, the assets of every class and kind would be equally divided between the parties in exchange for his stock, it would have been a simple matter  in fact, much simpler than the agreement actually made  to have said so. The fact that they did not, indicates an intention to exclude such a provision. See Azalea Park Utilities, Inc. v. Knox-Florida Development Corp., Fla.App. 1961, 127 So.2d 121; 12 Am. Jur., Contracts, Sec. 239.
By reconstructing the contract of the parties to accord with what he deemed to be the equities of the situation, the Master (and the courts which adopted and affirmed his recommendations) ignored the well settled rule that "courts may not rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain." Beach Resort Hotel Corporation v. Wieder, Fla. 1955, 79 So.2d 659. To like effect are the decisions of this court in Sapienza v. Bass, Fla.App., 1962, 144 So.2d 520; Gendzier v. Bielecki, Fla. 1957, 97 So.2d 604; and Pierce v. Isaac, 1938, 134 Fla. 666, 184 So. 509. See also Zapetis v. Wills, Fla.App. 1963, 156 So.2d 33; and Stemmler v. Moon Jewelry Co., Fla.App. 1962, 139 So.2d 150.
In an attempt to support the decree in question, it is contended on behalf of the respondent-Bursani that "book value" is not a word or art with a fixed, legal meaning; that it was necessary for the Special Master to receive evidence as to what the parties had in mind when they made the contract; and that the evidence showed that the purpose of the contract "was to permit the parties to divide the assets equally between them without the necessity of dissolving the corporation."
This may have been the intention of Mr. Bursani in entering into the stock-purchase agreement; but the fact remains that this is not what the agreement and charter provision said, as noted above. The Special Master found that, although Mr. Deeb was the "dominant party" throughout the business dealings of the parties, Mr. Bursani was not coerced into entering into the agreement and did so of his "own free will and accord." Here, as in Gendzier v. Bielecki, Fla., 97 So.2d 604, 608:
"* * * no effort was made to establish fraud, mistake or error. The appellees merely undertook to prove a personal unilateral intent with reference to their own motive in signing the document. The rule is well established *118 in this state * * * that when competent parties reduce their engagements to writing in terms that create a legal obligation without any uncertainty as to the object or extent of the engagement as between them, it is conclusively presumed that the whole engagement and the extent and manner of their undertaking is contained in the writing. The writing itself is the evidence of what they meant or intended by signing it. The test of the meaning and intention of the parties is the content of the written document. Ross v. Savage, 66 Fla. 106, 63 So. 148." (Emphasis added.)
So that there can be no misunderstanding, it should be noted that the respondents' contention as to the lack of any fixed legal meaning of the term "book value" finds support in a great many cases. It is sometimes held to mean "market value," see Steeg v. Leopold Weil Bldg. & Impr. Co. (1910) 126 La. 101, 52 So. 232, and sometimes not, see Pohlman Company v. Easterling (1962) 211 Cal. App.2d 466, 27 Cal. Rptr. 450. And see the cases collected in the annotation in 51 A.L.R.2d page 606 et seq.
Here, however, there was no need to decide whether "book value" meant "market value", since the charter specifically provided that the purchase price of the stock was to be either, "whichever shall be higher in dollar value." Instead of determining which it was to be, the Special Master simply ignored this provision of the contract altogether and held that the Deebs should have "offered to share the corporate assets of every class and kind equally with the Bursanis." This, as noted, was in direct conflict with the decisions of this court noted above.
The audit showed that on December 17, 1959, the corporation had a net worth of assets over liabilities in the amount of $36,882.76, not including any anticipated profit on nine houses which had been built but not sold. On this basis the book value of the Bursani stock would have been one-half of that amount, or $18,441.38. There was an additional approximate amount of $8,000.00 due Mr. Bursani by the corporation for notes and open account items. It must be noted that under the terms of the charter and the contract the book value of $18,441.38 was, under the circumstances here present, payable in assets of the corporation rather than money, but the items totalling $8,000.00 due him by the corporation were personal assets for which he had a lawful right to demand payment in cash. The Special Master (approved by the court) proceeded to amend the audit by making his determination of the anticipated profit he felt the corporation would make if and when it sold the houses. Basing his findings of fact on the past earning history of the corporation (rather than the current market for the houses) he found that the corporation would earn, after a 30% tax deduction, the sum of $16,118.20. By adding this item of anticipated profits to the audit value of the corporation fixed at $36,882.76, it is obvious the Master reached a conclusion that the value of the stock (including the anticipated profit) was $53,000.96, rather than $36,882.76. He then obviously arrived at the total value of the claim of Bursani as being one-half of $53,000.96, or $26,500.48, plus approximately $8,000.00 for notes and miscellaneous items, reaching a total of $34,694.98, and then recommended a money judgment for that amount against the corporation and the Deebs personally.
It therefore becomes important in the final disposition of this litigation as to whether or not the Master used the proper guidelines in estimating a profit of $16,118.20 for the finished but unsold nine houses. We think he did not. His finding was based on the past history of the corporation on houses previously built and sold. This was error since many other factors, such as the market demand for new houses, prospective population increases, the availability of mortgage money and terms, interest rates, history of other *119 sales in the area on or about December 17, 1959, and the competition, if any, of other builders in the same general area competing for the same customers, would under the circumstances here present have a direct effect on the regular market value. It was not enough to look merely to the history of prior activities of the corporation. In All Florida Surety Company v. Vann, 128 So.2d 768, DCA, Third District, the court said:
"The alleged damages based upon loss of dividends or profits were necessarily based upon what profit or dividend would have emanated from the corporation had it not been dissolved. Profits of this nature are not capable of ascertainment with reasonable certainty and recovery cannot be had for loss of profits which are uncertain, contingent, conjectural or speculative. Twyman v. Roell, 123 Fla. 2, 166 So. 215, and cases collected in 9 Fla.Jur., Damages, § 79." (Italics supplied.)
On the record here presented, it was error to add the anticipated profit of $16,118.20 to the net worth of the corporation, and for that reason the equitable lien in the amount of $34,694.98 impressed by the trial court was at least excessive to the extent of $8,059.10 which he had included therein.
We realize that in a business of this kind many changes have perhaps occurred in its physical assets since December 17, 1959, and it will require diligent effort at this late date to reconstruct the physical assets and distribute them in accordance with the terms of the contract. In this connection, however, we point to the many remedies available in equity and the extension of its long arm which frequently includes such remedies as receivership, receivership sales, partition of assets in the hands of the receiver, commissioners of the court to carry out equitable partition, and where applicable the remedies for incompatible management in corporations provided by Florida Statute 608.28, F.S.A. The cause should be remanded with directions to determine the rights of the parties against the corporation under the contract considering the principle of equitable conversion where the long lapse of time has resulted in conversion of any of the physical assets into money or securities. Significant also is protection of the limited liability afforded to individual stockholders by the corporation laws of this state, and in this instance the obligation to pay in dollars or assets under the terms of the contract was by the corporation and not the individual stockholders.
The decision of the District Court of Appeal, Second District, is quashed, with directions to remand the cause to the trial court for further proceedings not inconsistent with this opinion.
It is so ordered.
DREW, CALDWELL and ERVIN, JJ., concur.
O'CONNELL, J., concurs specially with opinion.
THORNAL, C.J., dissents with opinion.
O'CONNELL, Justice (concurring specially).
It has been and is my personal view that this Court does not have jurisdiction to review, because of conflict, a decision of a district court of appeal which affirms a judgment of a trial court per curiam without opinion. I have consistently voiced and voted this view in the cases decided by this Court, relaxing it only to the point of agreeing to request a district court to write an opinion where the circumstances warranted. Now, however, a majority of this Court in Foley v. Weaver Drugs, Inc., Fla. 1965, 168 So.2d 749, have held that this Court does have jurisdiction to review such a per curiam decision without opinion under the conditions detailed therein. *120 I am bound by this decision of a majority of this Court and compelled to follow it. Moreover, as I interpret it, Canon 19, Rule A, Ethics Governing Judges, 31 F.S.A., requires that an appellate judge, after having repeatedly made the effort to persuade his brother judges to his view and failed to convince a majority, must then give to the opinion and decision of the majority the same loyalty and recognition that the bench and bar are expected to give to it. For this reason I do not now dissent from the opinion of Mr. Justice Roberts on the issue of jurisdiction in this case. I concur in his opinion on the merits.
THORNAL, Chief Justice (dissenting).
I still have view that the Supreme Court lacks jurisdiction. I do not feel that the Constitution permits me to waive a jurisdictional requirement. See my dissent in Foley v. Weaver Drugs, Inc., Fla., 168 So.2d 749.