In re **MISSION HEALTH, INC.** f/k/a **Baptist/St. Vincent's Integrated Delivery Organization, Inc.,** Debtor.

No. 99–05019–3F1.

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

July 12, 2000.

R. Scott Shuker, Kay Gronek & Latham, LLP, Orlando, FL, for Debtor.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This Case came before the Court upon the Objection to Claim of A.H. Nezami, M.D. (Claim No. 324) filed by Mission Health, Inc. ("Debtor") on December 14, 1999. (Doc. 249A.) On April 21, 2000 the Court conducted an evidentiary hearing on this objection. At the conclusion of the presentation of evidence, the Court asked the parties to file memoranda of law and proposed orders in lieu of argument.[1] Based upon the evidence presented and the submissions of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

#### a. Background

On September 1, 1998 A.H. Nezami, M.D. ("Nezami"), entered a Specialty Care Physician Agreement ("Agreement") with North Florida Physicians Association, Inc. ("NFPA"). NFPA is an independent med-

---

1. Dr. Nezami proceeds pro se in this matter.

ical practice association with member physicians in Northeast Florida. Nezami is certified by the American Board of Plastic Surgery, Inc. in plastic and reconstructive surgery, and is licensed in the State of Florida to practice medicine and surgery. Nezami has practiced medicine in Northeast Florida since 1981.

Debtor entered a joint venture with NFPA to provide integrated health care services to various health maintenance organizations ("HMOs"). Debtor and NFPA established a network of physicians, hospital and other health care providers to provide health care services to HMOs' enrollees. Debtor contracted with HMOs to provide services to the HMOs' enrollees and Debtor received monthly premiums from the HMOs for providing such services. Nezami provided health care to the HMOs' enrollees under his Agreement with NFPA, which was done as part of Debtor's joint venture with NFPA. All Participating Providers[2], such as Nezami, contracted with NFPA. NFPA assigned all its rights and duties under these contracts to Debtor, who administered these contracts.

**b. Nezami's Claim**

On July 3, 1999 Debtor filed a petition under Chapter 11 of the Bankruptcy Code. On October 15, 1999 Nezami filed a proof of claim in the total amount of $50,697.86 based on services performed. (Claim No. 324.) In support of his claim, Nezami attached the following:

**PROOF OF CLAIM SUPPORTING DOCUMENT**

| | |
|---|---|
| Contact Capitation Commercial May/June/July | $ 4,065.13 |
| Contact Capitation Medicare May/June/July | $ 1,660.06 |

[2] Participating Provider is defined under the Agreement as "a Participating Physician, Participating Hospital, or other licensed health facility or licensed health professional which has entered into an agreement with NFPA or IDO [Debtor] to provide Covered Services to Enrollees." Participating Physician is de-

| | |
|---|---|
| Fee for service reimbursement for Pediatric service | $ 14.17 |
| Other pediatric return check | $ 479.71 |
| Claims which have been approved but not included in above capitation payment | $ 1,049.84 |
| Supplies not included in capitation | $ 175.25 |
| Claims denied stating not authorized but authorization is in the file | $ 8,355.00 |
| 51 contract adult which should have been paid for the next 11 months at $2322.61 per month—amount paid for July ($156.75) | $25,391.96 |
| 7 contract senior Medicare which should have been paid for the next 11 months at $869.5 per month—amount paid for July ($57.90) | $ 9,506.71 |
| **Total** | **$50,697.86** |

At the hearing Nezami claimed the amount owed was actually $47,964.53, having reduced "Claims denied stating not authorized but authorization is in the file" to $5,475.00 and increased "Claims which have been approved but not included in above capitation payment" to $1,196.54. Debtor's Proof of Claim Reconciliation Worksheet set forth that Nezami is entitled to:

| Type of Claim | Money Owed to Creditor as Determined by Debtor | |
|---|---|---|
| Contact Capitation (May, June, and July) | Commercial: | $4,065.13 |
| | Medicare: | $1,660.09 |
| Fee for Service Reimbursement for Pediatric Services | | $ 14.17 |
| Other (Returned Checks) | | $ 479.71 |
| **Total** | | **$6,219.10** |

On December 14, 1999 Debtor filed an objection to Nezami's claim. (Doc. 249A.) On January 3, 2000 Nezami filed a response to Debtor's objection claiming that: (1) Debtor failed to process all claims pre-

fined under the Agreement as "a physician (duly licensed to practice medicine ... in accordance with applicable Florida law) who has entered into an agreement with NFPA to provide Covered Services to Enrollees." Nezami was both a Participating Provider and a Participating Physician.

sented to them, (2) that some claims were unjustifiably rejected when proper authorization was on file, (3) services rendered by Nezami for Dermatology were not properly compensated, and (4) compensations paid were partial payments and did not include the total amounts due. (Doc. 342)

At the hearing, Debtor submitted the following comparison:

### COMPARISON OF CLAIM AMOUNTS A.H. NEZAMI, M.D. VERSUS MISSION:HEALTH

| Issue | Nezami Amount | M:H Amount | Comments |
|---|---|---|---|
| Contact Capitation Commercial May/June/July | $ 4, 065.13 | $4,065.13 | Agree |
| Contact Capitation Medicare May/June/July | $ 1,660.06 | $1,660.13 | Agree |
| Fee for service pediatrics | $ 14.17 | $ 14.17 | Agree |
| Pediatric return check | $ 479.71 | $ 479.71 | Agree |
| Claims approved but not included in capitation report | $ 1,196.54 | $ 0.00 | Statistical claims processed after 7/2/99 |
| Supplies | $ 175.25 | $ 100.00 | Agree to contracted rate |
| Claims denied "no authorization" | $ 8,355.00 | $ 0.00 | Auth. on file, claim reprocessed as statistical. |
| 51 commercial contacts for 11 additional months | $25,391.96 | $ 0.00 | Claims considered paid as set forth in Agreement |
| 7 medicare contacts for 11 additional months | $ 9,506.71 | $ 0.00 | Claims considered paid as set forth in Agreement |
| Total: | $47,964.53 | $6,319.07 | |

### c. The Agreement

Article IV of the Agreement entitled "Compensation" provides that "NFPA shall provide Physician [Nezami] with copies of Plan exhibits ... setting forth the payment rates ('Payment Rates') due Physician." Pursuant to the Agreement, the primary method of Nezami's compensation is known as "Capitation", a method of compensation under which Participating Providers, such as Nezami, are reimbursed through a predetermined monthly payment. The capitation compensation method od is not based on a "Fee–for–Service" arrangement under which providers' reimbursement is based on the billed charges for a particular service.

Under the Agreement's capitation compensation method, Nezami agreed to a predetermined monthly payment that was unrelated to the charge or cost of the actual services. The predetermined payment was based on the number of new patients or "contacts" seen during a respective month. This type of capitation is referred to as "Contact Capitation."[3]

**3.** Nezami's post-trial memorandum sets forth an example of his understanding of how the

Critical to fully understanding Contact Capitation and Nezami's claim are Attachment A amended 10/1/98 titled "Compensation Capitation Rate" and Attachment B titled "Unique Patient Referral Encounter Contact Capitation" to the Agreement.[4] Attachment A sets forth the method of compensation to an entire group of specialty providers, in this case plastic surgeons. Attachment A states that an Individual Specialty Pool ("Pool") will be funded on a monthly basis to compensate all participating plastic surgeons. The Pool for plastic surgery received 0.82% of the monthly specialty premium allocation for commercial work and 0.62% of the monthly specialty premium allocation for Medicare work.

Attachment B delineates how the pool of plastic surgeons agreed to divide the monthly Pool.[5] The Pool is split *pro rata* based on the number of new contacts managed during a particular month. Specifically, Attachment B states that Nezami will receive one contact point for each new patient managed during the month. At month's end, the total cumulative contact points for all Participating Physicians within the specialty group were tabulated and each respective Participating Physician received his *pro rata* share of the Pool based on his percentage of contact points for the respective month. Each contact was counted for 12 continuous months unless a respective patient disenrolls, dies, or changes physicians within the specialty, in

compensation calculation was made. (Doc. 711.) He states:

   c. To illustrate this type of monthly compensation, it was explained that in July 1998 the payment for each contact point each month for plastic surgery services was about $100.00. Therefore for each patient seen and treated Nezami would receive about $100.00 a month for 12 months which totals $1200.00 for the entire period.

   d. To determine the amount of monthly payment for each contact point each month, at the end of the month, the total cumulative contact points (new contacts and old contacts) for all physicians within a Specialty are tabulated. The "Individual Specialty Pool" dollars is then divided in that month by the total cumulative contact point of the specialty, which therefore determine that month payment for each contact. This is then multiplied by the physician's cumulative contact points to determine the physician's payment for the month.

   e. To illustrate the working of contact capitation, if it was assumed that there are 4 participating plastic surgeons and each of the surgeons manages 5 new patients in the first month, then each physician has 5 contact points and total cumulative contact points for all surgeons is 20 for that month. To determine the payment for each contact point, then specialty pool dollars are divided by 20. Each physician then receives that month 5 times this amount since they each had 5 contact points.

In the second month, assume one of the plastic surgeons manages 10 new patients and the others each see 5 patients, because contacts are counted for 12 months, the total contact now equals 45 (20 from the first month 25 from the second). The specialty pool dollars are divided by 45, the physician with the 10 new contacts now has 15 cumulative contacts, therefore receive the 2nd month 15 times this amount and others receive 10 times....

   g. The individual specialty pool dollars are calculated each month by the number of members enrolled multiplied by $0.21 for adult commercial and by $0.42 for Medicare.

   h. If it was assumed that there are 100,000 insured in a month, then the plastic surgery pool dollars to be distributed for that month is 100,000 × $0.21 = $21,000 for adult contact.

(sic). Nezami's example mimics that of Debtor's in its April 18, 2000 memorandum (Doc. 616) and is correct except that it does not account for patients disenrolling, dying, or changing physicians within the specialty. The Agreement provides that if such event occurs the contact point for that patient ends immediately.

**4.** The original Attachment A effective September 1, 1998 and titled "Payment Rates" is consistent with the Agreement and the amended attachment.

**5.** Between January and July of 1999 the Plastic Surgery Pool consisted of three physicians, including Nezami.

which case the contact point for such patient ends immediately.

### CONCLUSIONS OF LAW

■ Objections to claims are governed by 11 U.S.C. § 502(a), providing that "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, ... objects." 11 U.S.C. § 502 (West 2000). Section 502(b) provides, "... [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount...." *Id.* A proof of claim filed in accordance with the rules "shall constitute prima facie evidence of the validity and amount of the claim." FED. R. BANKR. P. 3001(f).

■ The burden of proof is on the objecting party to produce evidence "equivalent in probative value to that of the creditor to rebut the prima facie effect of the proof of claim. However, the burden of ultimate persuasion rests with the claimant." *In re VTN, Inc.,* 69 B.R. 1005 (Bankr.S.D.Fla.1987) (citing *In re DeLorean Motor Co. Litig.,* 59 B.R. 329 (E.D.Mich.1986)).

Debtor presented ample evidence to rebut the prima facie effect of Nezami's proof of claim. Nezami's filed claim was scant, consisting of the Proof of Claim document and the supporting document incorporated in the Findings of Fact made above. Debtor meticulously proceeded through the mechanics of the Agreement and explained how provider compensation was calculated. By doing so, Debtor established that the terms of the Agreement did not provide for the full amount of Nezami's claim. Therefore, the burden shifted to Nezami. For the reasons set forth below, the Court finds that Nezami failed to establish entitlement to his claim.

Nezami does not dispute the validity of the Agreement or that he was bound by the Agreement. Rather, Nezami claims he is entitled to additional compensation under the contact capitation calculation based on the 12–month continuous contact factor used in the calculation. Nezami claims that the Agreement should "run out", meaning that he is entitled to 12 months of payment for each patient he provided services for in a particular month. Under Nezami's interpretation of the Agreement, his providing service to a patient in June 2000 would require payment for that patient through June 2001, despite the fact that Debtor no longer receives payment from the HMOs. It is under this interpretation that Nezami claims he is entitled to $34,898.67. Accordingly, the Court looks to the terms of the Agreement to determine whether Nezami is entitled to this portion of his claim.

■ Contract language that is unambiguous on its face must be given its plain meaning. *See Green v. Life & Health of America,* 704 So.2d 1386, 1391 (Fla.1998). *See also Jacksonville Terminal Co. v. Railway Express Agency, Inc.,* 296 F.2d 256, 259 (5th Cir.1961), *cert. denied,* 369 U.S. 860, 82 S.Ct. 949, 8 L.Ed.2d 18 (1962) (stating "Where the language chosen by the parties, given its ordinary and natural meaning, unambiguously manifest that intention, the judicial task is at an end."); *Pafford v. Standard Life Ins. Co.,* 52 So.2d 910, 911 (Fla.1951) (finding courts are not at liberty to modify meaning of a well-settled contracts); *Pierce v. Isaac,* 134 Fla. 666, 184 So. 509, 513 (1938) (holding that voluntarily and fairly made contracts will be upheld by the courts); *Home Dev. Co. v. Bursani,* 178 So.2d 113, 114 (Fla. 1965) (noting that courts are not authorized to rewrite a contract of the parties).

Under Florida law, when the terms of a contract are unambiguous, the Court is bound to give the language therein its plain and ordinary meaning. In such a case, contract construction is a matter of law for the Court to decide. In interpreting the words of a clearly-worded contract, the Court may not add or sub-

tract language from the face of the instrument and may not make a new contract for the parties where their intent can be easily inferred from the contract itself.

*Quesada v. Federal Emergency Management Agency*, 577 F.Supp. 695, 697 (S.D.Fla.1983), *aff'd* 753 F.2d 1011 (11th Cir.1985) (citations omitted). *See also Hamilton Constr. Co. v. Board of Public Instruction*, 65 So.2d 729, 731 (Fla.1953) (finding no right to give meaning other than that expressed in clear and unambiguous contract).

The language in the Agreement is directly contrary to Nezami's interpretation. Attachment A to the Agreement states that the dollars funded to the Individual Specialty Pool are "payment in full for those Covered Services rendered to Enrollees." Moreover, Attachment B states that "[n]o excesses or deficits will occur as payment in full for services provided is limited to the monies available for distribution in the Individual Specialty Pool, and all monies are distributed each month." Attachment B also states that Debtor "will provide for the distribution of the monthly contact capitation specialty payments using a contact point system which distributes to the Physicians on a pro-rated basis the Individual Specialty Pool **monies available for distribution** during that month ...". (emphasis added). Accordingly, the full compensation due under the Agreement is the distribution of the monthly pool.

At the time of filing, Debtor had not paid most Participating Providers for June 1999 and the first two days of July. Correspondingly, Debtor had approximately one month's premium in cash available for distribution. Under the Agreement, Nezami's contractual entitlement was limited to

his rights to Debtor's available funds at the time of filing. The use of contacts for 12 months was simply a means of calculating the distribution of the specialty pool. The Agreement contained no "run out" provisions for purposes of actual compensation. Rather, the "run out" Nezami claims entitlement to is a method of calculation, not a method of compensation. According to Debtor, the 12–month calculation provision was requested by physicians as a means to smooth out possible variations in contacts and to allow an averaging of contacts, i.e. a risk factor. The contact points were a means of dividing a monthly pool and were not a right or entitlement to continuing compensation for any particular charge or service.

In addition to the specific contractual provisions noted above, the Agreement implicitly indicates Nezami knew he was taking a risk related to the cessation of monthly premium dollars. Attachment B indicates that a contact is terminated when a patient disenrolls or dies. This was an inherent risk in the Agreement from its inception. Although it does not appear Nezami did so, careful scrutiny of the Agreement prior to Nezami's entering into the Agreement would have revealed such risk.[6]

As of July 3, 1999 all of Debtor's enrollees were, as to Debtor, disenrolled, and the ongoing financial responsibility reverted to the HMOs who held the underlying subscriber contracts. For all enrollees, including Nezami's contacts, the insurance premium paid to Debtor by the HMOs was terminated. Therefore, under the Agreement, Nezami's right to payment was terminated upon Debtor's filing as such right was directly tied to Debtor's receipt of continuing premium payments from the

---

**6.** Paragraph 13.13 of the Agreement provides that:

> This Agreement supersedes any and all agreements, either written or oral, between the parties hereto with respect to the subject matter contained herein.... Each party to this Agreement acknowledges that no

representations, inducements, promises, or agreements, oral or otherwise, have been made by either party, or anyone acting on behalf of either party, which are not embodied herein, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding.

HMOs. Accordingly, Debtor's objection as to Nezami's claim of $34,898.67 based on "run out" will be sustained.

Additionally, Debtor failed to satisfy his burden for his claim based on "Claims which have been approved but not included in above capitation payment", "Supplies not included in capitation", and "Claims denied stating not authorized but authorization is in the file." Debtor agrees that Nezami is entitled to a total of $100.00 for these categories of claims. Accordingly, Debtor's objection to the remaining balance of these portions of Nezami's claim will be sustained.

## CONCLUSION

Nezami is bound by the Agreement he entered and such Agreement dictates the terms of his compensation. When Debtor filed for bankruptcy protection, the HMOs, who paid Debtor to provide health care services to their enrollees and in turn Debtor funded pools from which providers such as Nezami were paid, ceased making payment to Debtor. In turn, Debtor ceased providing health care services and enrollees' health care responsibilities reverted to the HMOs. Therefore, after July 3, 1999 Debtor ceased funding from the pools from which providers' compensation was limited to and the responsibility of reimbursing providers reverted to the HMOs. Nezami failed to establish that he was entitled to any payment beyond that specifically set forth in the Agreement.

Although the mechanics of the Agreement are complex, the law is clear. Nezami entered the Agreement with Debtor, the Agreement is a valid contract, and Nezami is bound by its terms. A separate order will be entered in accordance with these Findings of Fact and Conclusions of Law.