COHEN, J.
Life Care Ponte Vedra, Inc. d/b/a Vicar’s Landing (“Vicar’s Landing”), defendant below, appeals portions of a final summary judgment entered in favor of plaintiffs below, H.K. Wu and Kathleen Wu (“the Wus”).[1] The case centers on the interpretation of a residence and care contract (“the Contract”) that the parties entered into in 2011. We reverse.
Vicar’s Landing owns and operates a continuing care retirement community that is regulated by chapter 651, Florida Statutes (2013), and the Wus are retired professors. On July 20, 2011, the Wus entered into the Contract with Vicar’s Landing. The Contract was executed during a meeting between the Wus and Tess Crosby, an employee of Vicar’s Landing.
Under the Contract, the Wus were required to pay an entrance fee of $352,000, with ten percent due at signing, and the remainder due “on or before the [o]ccu-pancy [djate, unless otherwise previously agreed to in wrjting.” They also agreed to pay a “non-refundable, non-interest bearing second-member fee.” Additionally, the *190 Wus were required to pay a monthly service fee of $5,733 per month.
That same day, the Wus also executed a separate agreement with Vicar’s Landing (“the Incentive Agreement”). Under the Incentive Agreement, the total entrance fee was due on October 20, 2011, and the Wus’ monthly service fee would commence on October 20, 2011. The Incentive Agreement provides that the Wus’ monthly fee would be only half of that required by the Contract “as long as [the unit] is unoccupied.”[2]
Thereafter, upon the Wus’ request, Vicar’s Landing agreed to extend the October 20, 2011 deadline to October 31, 2011. In an email to a Vicar’s Landing employee, the Wus explained: “According to our understanding, full payment to Vicar’s Landing of our Entrance Fee balance is expected on Monday, October 31, 2011, known in the contract as the ‘Occupancy Date.’” Accordingly, on October 31, 2011, the Wus paid the remaining balance on the entrance fee, the entire second member fee, and the first monthly service payment. Taking advantage of the Incentive Agreement, the Wus did not move into the unit and paid, only half of the monthly service fee. Although the Wus did not physically occupy the unit during this time, they did move certain possessions into it, and Vicar’s Landing was unable to market the unit to prospective members.
The Wus continued to pay the monthly service fee until April 26, 2012, when they informed Vicar’s Landing that they would be terminating the Contract. The Wus demanded to receive a refund of the entire entrance fee in accordance with section 8.A of the Contract, which provides: “Termination Prior to Occupancy. If you terminate this Contract prior to the date you occupy your Residence ... you will be entitled to a reimbursement of any monies paid, less a processing fee of four (4%) of the Entrance Fee....”
By contrast, Vicar’s Landing contended that the refund of the entrance fee was governed by section 8.D of the Contract, which provides:
Refund of Entrance Fee After Occupancy.
After termination of this Contract in accordance with Section 8.B., we will refund an amount equal to the Entrance Fee (without interest), minus an amount equal to the sum of (a) two percent (2%) per month for each of the first forty-eight (48) months during which you occupied your Residence, plus (b) a four percent (4%) processing fee.
Although the Contract does not define the words “occupy” or “occupancy,” section 7.A defines “Occupancy Date” as follows:
Unless the move-in period is extended by Vicar’s Landing in its sole discretion, you must assume occupancy within 60 days after executing this Contract and paying the ten percent (10%) deposit or first installment of the Entrance Fee or within sixty (60) days after the apartment is vacated, whichever occurs later. Your financial obligations under the Contract will begin when you assume occupancy or at the end of the sixty (60) day move-in period, whichever occurs first. In any event, you shall not be required to move into Vicar’s Landing earlier than seven (7) days following the date you executed this Contract and *191 paid the first installment of the Entrance Fee.
Vicar’s Landing issued a refund to the Wus pursuant to section 8.D of the Contract. Since the parties could not agree about which section applied, the Wus filed the instant breach of contract action, seeking to recoup the difference between what they claimed they were owed under section 8.A and what Vicar’s Landing paid them under section 8.D. At summary judgment, the trial court found that the language contained in the Incentive Agreement, which included the terms “unoccupied” and “occupy,” created an ambiguity, because the word “occupy” in the Incentive Agreement meant “the equivalent of moving in or assuming residency at [Vicar’s Landing].” The trial court further ruled that the ambiguous language must be interpreted against the drafter — Vicar’s Landing — and found that “the term ‘occupancy or ‘occupy5 used in section 8 of the Contract, is equivalent to moving into or assuming residency at Vicar’s [Landing].” Vicar’s Landing timely appealed.
Our review is de novo. See, e.g., Wash. Nat’l Ins. Corp. v. Ruderman, 117 So.3d 943, 948 (Fla.2013); Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000).
Initially, we agree with Vicar’s Landing that the construction against the drafter rule is a secondary rule of interpretation, which should be used only if the parties’ intent cannot be ascertained by other means. See, e.g., DSL Internet Corp. v. TigerDirect, 907 So.2d 1203 (Fla. 3d DCA 2005); see also In re Standard Jury Instructions—Contract & Bus. Cases, 116 So.3d 284, 318 (Fla.2013) (“This instruction endeavors to explain to the jury that this principle should be secondary to the consideration of other means of interpretation, principally the consideration of parol evidence that may explain the parties’ intent at the time they entered into the contract.” (citing W. Yellow Pine Co. v. Sinclair, 83 Fla. 118, 90 So. 828, 831 (1922))). The trial court erred when it immediately interpreted the Contract against the drafter without considering any other evidence of the parties’ intent.[3]
Additionally, the trial court erred in failing to consider extrinsic evidence. As a general rule, if a contract is ambiguous, the parties’ intent becomes a question of fact for the fact-finder, precluding sum *192 mary judgment. See, e.g., Berkowitz v. Delaire Country Club, Inc., 126 So.3d 1215, 1219 (Fla. 4th DCA 2012). However, a contract may be interpreted as a matter of law when the ambiguity can be resolved by undisputed parol evidence of the, parties’ intent. Decoplage Condo. Ass’n, Inc. v. Deco Props. & Invs., Inc., 971 So.2d 860 (Fla. 3d DCA 2007).
Here, we agree with the trial court that the Contract was ambiguous as to the meaning of occupancy, but believe that the court should have considered extrinsic evidence of the parties’ intent.[4] For instance, there was evidence that the parties intended the statutory definition of “occupying” to control.[5] Additionally, the Wus specifically admitted in an email that they understood October 81 to be the “Occupancy Date.” Furthermore, the Wus moved personal possessions into their unit. In sum, we find the trial court erred in granting summary judgment and, therefore, reverse.
REVERSED.
TORPY, C.J. and SAWAYA, J., concur.

. The Wus also cross-appealed a portion of the summary judgment. Although we found their arguments persuasive, our holding renders the cross-appeal moot.

. The Contract and Incentive Agreement must be construed together under the "contemporaneous instrument rule,” which states that two documents that are executed by the same parties, at or near the same time, and concerning the same subject matter are generally construed together as a single contract. See Wilson v. Terwillinger, 140 So.3d 1122 (Fla. 5th DCA 2014).

. We disagree with the Wus that the Contract was one of adhesion. An adhesion contract is a "standardized contract form offered to consumers of goods and services on essentially [a] 'take it or leave it’ basis without affording [the] consumer [a] realistic opportunity to bargain and under such conditions that [the] consumer cannot obtain [the] desired product or services except by acquiescing in the form contract.” Powertel, Inc. v. Bexley, 743 So.2d 570, 574 (Fla. 1st DCA 1999) (quoting Black’s Law Dictionary (6th ed. 1990)).
In this case, evidence in the record suggests that, although Vicar’s Landing drafted the Contract, the Wus had more bargaining power than is typically available to consumers who sign adhesion contracts. Compare Powertel, 743 So.2d at 574-75 (holding arbitration clause was contract of adhesion where: (1) drafter prepared the clause unilaterally and sent it to customers as an insert to their monthly phone bill; (2) customers did not bargain for the clause; and (3) the customers did not have the power to reject it), with Gainesville Health Care Ctr., Inc. v. Weston, 857 So.2d 278, 285 (Fla. 1st DCA 2003) (holding that pre-printed nursing home contract was not a contract of adhesion where "[tjhere [was] no evidence to support a finding that [the contract] was offered to [the resident] (or anybody else) on a ‘take-it-or-leave-it’ basis" and there was nothing in the record to suggest that, had the resident so requested, the provision at issue would not have been deleted). The Wus discussed the terms of the Contract with Tess Crosby, were able to — and did — ask questions about the Contract, and actually crossed out a provision with which they disagreed.

. The parties disagree about whether the ambiguity is latent or patent, as extrinsic evidence is allowed only to explain latent ambiguities. See, e.g., Beach Street Bikes, Inc. v. Bourgett's Bike Works, Inc., 900 So.2d 697, 700-01 (Fla. 5th DCA 2005). We find the definition of occupancy to be a latent ambiguity or, at the very least, it falls into the category of "intermediate” ambiguities. See Ace Elec. Supply Co. v. Terra Nova Elec., Inc., 288 So.2d 544 (Fla. 1st DCA 1973). Thus, extrinsic evidence should have been considered.

. The statutory definition of "occupying” is found in section 651.055(l)(d), Florida Statutes, which provides:
If a prospective resident signs a contract but postpones moving into the facility, the individual is deemed to be occupying a unit at the facility when he or she pays the entrance fee or any portion of the fee, other than a reservation deposit, and begins making monthly maintenance fee payments. Such resident may rescind the contract and receive a full refund of any funds paid, without penalty or forfeiture, within 7 days after executing the contract as specified in subsection (2).
§ 651.055(l)(d), Fla. Stat. (2013).
We agree with Vicar’s Landing that "all existing applicable or relevant and valid statutes ... at'the time a contract is made become a part of it and must be read into it just as if an express provision to that effect were inserted therein, except where the contract discloses a contrary intention.” See, e.g., Northbrook Prop. & Cas. Ins. Co. v. R & J Crane Serv., Inc., 765 So.2d 836, 839 (Fla. 4th DCA 2000) (citing 17A. Am.Jur.2d Contracts § 381 (1991)). Thus, the trial court’s analysis was faulty to the extent that it found the statute "of little value” because "nowhere in the Contract does it state that occupancy therein will be determined based on the statutory definition.” We do not find the statute to be dispositive, however, for two reasons. First, it is possible that, by using the term "occupy” in the Incentive Agreement, the parties were expressing an intent to define the term in a manner contrary to the statutory definition. Second, the statute does not specify that its definition of occupying applies in the context of refunds; thus, it is not clear that the Legislature intended the definition to be incorporated into all parts of a residence and care contract.