# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 5D2024-0765
LT Case No. 2022-CA-3559

_____

HEATHER WASHINGTON,

    Appellant,

    v.

VYSTAR CREDIT UNION,

    Appellee.

_____


On appeal from the Circuit Court for Duval County.
Katie L. Dearing, Judge.

Jacob Phillips, of Jacobson Phillips PLLC, Altamonte Springs,
and Lynn A. Toops and Lisa M. La Fornara, of Cohen & Malad,
LLP, Indianapolis, Indiana, pro hac vice, and J. Gerard Stranch,
IV, of Stranch, Jennings & Garvey, PLLC, Nashville, Tennessee,
pro hoc vice, for Appellant.

Sara F. Holladay, Jason R. Bowyer, and Kathleen D. Dackiewicz,
of McGuireWoods LLP, Jacksonville, and Stuart M. Richter, of
Katten Muchin Rosenman LLP, Los Angeles, California, pro hac
vice, for Appellee.

February 6, 2026


EISNAUGLE, J.

Heather Washington appeals the dismissal of her amended complaint alleging breach of an account agreement (the "agreement") she had with VyStar Credit Union ("VyStar"). On appeal, Washington argues that certain overdraft fees charged to her account were not authorized by the agreement. Specifically, although her "available balance" was insufficient to pay these transactions at the time VyStar received an actual payment request from each merchant, Washington maintains that the overdraft fees were improper because her "available balance" was sufficient at the time she presented her card to the merchant. At the very least, she argues dismissal was improper because the agreement is ambiguous. After a fair reading of the entire agreement, we disagree with Washington and affirm.

## I

Washington maintained a checking account and an associated debit card with VyStar. The checking account was governed by an agreement informing Washington that VyStar would charge her overdraft fees if there were "insufficient" funds in the account to cover any given transaction. Section 14.a. explains:

> If, on any day, the available funds in your account are not sufficient to pay the full amount of a check, draft, transaction, or other item, plus any applicable fee, we may return the item or pay it, as described below. . . . Except as otherwise agreed in writing, if we exercise our right to use our discretion to pay such items that result in an insufficiency of funds in your account. . . . Your account may be subject to a charge for each item regardless of whether we pay or return the item.

Section 14.b. is titled "Courtesy Pay," and informs the account holder about VyStar's opt-in overdraft program for anyone who wants VyStar to "authorize and pay transactions that will result in insufficient funds in [the account holder's] account." That provision provides in pertinent part:

> This service allows us to *authorize payment* for the following types of transactions regardless of whether your account has sufficient funds: (1) share

2

drafts/checks and other transactions made using your checking account, except as otherwise described below; (2) automatic bill payments; (3) ACH transactions; and (4) ATM and one-time debit card transactions. You must affirmatively consent for Courtesy Pay coverage. Without your consent, the Credit Union may not *authorize and pay* transactions that will result in insufficient funds in your account.

(emphasis added).

In section 14.c., the agreement distinguishes an account's actual balance from its available balance. The actual balance is "the full amount of all deposits to your account as well as payment transactions that have been posted to your account. It does not reflect checks you have written and are still outstanding or transactions that have been *authorized but are still pending*." (emphasis added). By contrast, the available balance is:

your actual balance less: (1) holds placed on deposits; (2) holds on debit card or other transactions that *have been authorized but are not yet posted*; and (3) any other holds, such as holds related to pledges of account funds and minimum balance requirements or to comply with court orders.

(emphasis added).

This section also explains that overdrafts are measured against an account holder's available balance:

We use your available balance to determine whether there are sufficient funds in your account to pay items, including checks, as well as ACH, debit card, or other electronic transactions. Pending transactions and holds placed on your account may reduce your available balance and cause your account to become overdrawn regardless of your actual balance.

Section 14.d. identifies the types of transactions applicable to a checking account and explains how each type of transaction is

processed. For instance, an account holder might write a check, authorize an Automated Clearing House (ACH) payment (e.g. automatic bill pay), initiate a PIN-based debit card transaction, or make a signature-based debit card purchase. Given the differences between each, "there are many ways transactions are *presented for payment by merchants*, and [VyStar is] not necessarily in control of when transactions are received." (emphasis added).

While our primary focus will be on signature-based debit card transactions, understanding the broader payment process will provide context to the disputed language in the agreement. VyStar receives payment requests from the Federal Reserve for two types of transactions: checks and ACH transactions. These requests arrive as data files. With respect to checks, Section 14.d. specifies that VyStar receives data files only for checks that have already been cashed—which is not surprising given the data is received from the Federal Reserve instead of the merchant.

There are also two types of debit card transactions—PIN-based and signature-based. Unlike checks or ACH transactions, payment requests for debit card transactions are submitted directly to VyStar by the merchant.

A PIN-based debit card transaction operates much like an ATM withdrawal because "the money is usually deducted from [the] account immediately at the time of the transaction."

A signature-based debit card transaction—the type of transaction at issue in this appeal—operates differently. In a signature-based transaction, the account holder typically signs for the purchase and, similar to a check, there is a delay between the time of purchase and VyStar's receipt of the merchant's payment request. For this reason, the agreement recognizes that merchants often seek authorization for these transactions at the time of purchase. According to the agreement, a merchant's authorization request will place a hold on the "available balance by the amount authorized."

Importantly, section 14.d. discloses that, after a signature-based transaction is authorized, VyStar will post the transaction

4

upon receipt of the merchant's request for payment.  Specifically, the agreement provides that after authorization:

> The transaction is *subsequently processed by the merchant and submitted to us for payment.* This can happen hours or sometimes days after the transaction, depending on the merchant and its payment processor. These *payment* requests are received in real time throughout the day and are *posted* to your account when they are received.

(emphasis added).

Section 14.d. also includes a warning.  The amount of an authorization hold may differ from the amount of the merchant's subsequent payment request.  Likewise, there is no guarantee as to when, or in what order, transactions will reach VyStar for payment; that timing depends largely on each merchant.  On this point, the agreement provides:

> *The amount of an authorization hold may differ from the actual payment because the final transaction amount may not yet be known to the merchant when you present your card for payment.*  For example, if you use your debit card at a restaurant, a hold will be placed in an amount equal to the bill presented to you; but *when the transaction posts, it will include any tip that you may have added to the bill.*  This may also be the case where you present your debit card for payment at gas stations, hotels, and certain other retail establishments.  *We cannot control how much a merchant asks us to authorize, or when a merchant submits a transaction for payment.*

(emphasis added).

Section 14.e. explains that VyStar may process and pay items in any order, and that the order in which items are processed may affect the total amount of overdraft fees charged to the account.  That section is titled "Order of Payments" and provides, in pertinent part:

5

The above is a general description of certain types of transactions. Checks, drafts, transactions, and other items may not be processed in the order that you make them or in the order that we receive them. *Checks, drafts, transactions, and other items will generally be processed and posted after ACH credits, mail deposits and ACH debits have been posted to your account.* These practices may change, and we reserve the right to *pay* items in any order we choose as permitted by law. The order in which we process checks, drafts, transactions, or other items, on your account may affect the total amount of overdraft fees that may be charged to your account.

(emphasis added).

The parties also entered into a related electronic funds transfer agreement (the "electronic funds agreement"). Washington contends that section 1.b. of the electronic funds agreement is relevant to this appeal. It provides in pertinent part:

*If you initiate a transaction that overdraws your account*, you agree to make immediate payment of any overdrafts together with any service charges to the Credit Union, which may be applied to reoccurring debits or transfers of funds from approved overdraft protection accounts.

(emphasis added).

## II

Washington filed suit alleging that VyStar improperly charged her overdraft fees on several signature-based debit transactions. In her amended complaint, she claimed these transactions did not overdraw her account because her "available balance" was sufficient at the time VyStar authorized payment for each transaction. According to Washington, the agreement provides *inter alia* that an overdraft is determined at the time of

6

authorization, and not when VyStar subsequently receives a request for payment from the merchant.

VyStar moved to dismiss Washington's amended complaint, arguing the agreement unambiguously provides that overdrafts are determined at the time VyStar pays the merchant. Washington countered that overdrafts are determined at authorization, or, at a minimum, that the agreement is ambiguous and the ambiguity precluded dismissal. The trial court found no ambiguity, adopted VyStar's interpretation of the agreement, and dismissed the amended complaint. This appeal follows.

### III

We review an order granting a motion to dismiss de novo. *Graulau Maldonado v. Orange Cnty. Pub. Libr. Sys.*, 273 So. 3d 278, 279 (Fla. 5th DCA 2019). A breach of contract claim is properly dismissed "where the plain language of the contract upon which the claim is based unambiguously establishes that the defendant did not breach the duty alleged in the complaint." *Detwiler v. Bank of Cent. Fla.*, 736 So. 2d 757, 758 (Fla. 5th DCA 1999).

We also review a trial court's interpretation of a contract de novo. *Nabbie v. Orlando Outlet Owner, LLC*, 237 So. 3d 463, 466 (Fla. 5th DCA 2018). "When interpreting any legal text, we follow the 'supremacy-of-text principle'—namely, the principle that '[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.'" *Atl. Candy Co. v. Yowie N. Am., Inc.*, 400 So. 3d 850, 854 (Fla. 5th DCA 2025) (alteration in original; citation omitted). To that end, we must "arrive at a fair reading of the text by determining the application of [the] text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *USAA Cas. Ins. Co. v. Mikrogiannakis*, 342 So. 3d 871, 873 (Fla. 5th DCA 2022) (citation omitted).

We are keenly aware that "[c]ontext always matters" because "sound interpretation requires paying attention to the whole [text], not homing in on isolated words or even isolated sections." *State v. McKenzie*, 331 So. 3d 666, 671 (Fla. 2021) (citation omitted). But

7

context is used only to understand the terms of the text, not as an excuse for rewriting it.  *Id.*

Finally, a contract is ambiguous "only if it is susceptible to more than one *reasonable* interpretation."  *Nabbie*, 237 So. 3d at 466 (citation omitted).  "The plainness or ambiguity of [a legal text] is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the [text] as a whole."  *Conage v. United States*, 346 So. 3d 594, 598 (Fla. 2022) (citation omitted).

"A true ambiguity does not exist in a contract merely because the contract can possibly be interpreted in more than one manner. Indeed, fanciful, inconsistent, and absurd interpretations of plain language are always possible."  *Nabbie*, 237 So. 3d at 467 (citation omitted).  Therefore, if "one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner."  *Vyfvinkel v. Vyfvinkel*, 135 So. 3d 384, 386 (Fla. 5th DCA 2014) (citations omitted).

## IV

On appeal, Washington argues *inter alia* that (1) the agreement unambiguously requires VyStar to determine overdrafts at the time of authorization, and not at the time VyStar pays a merchant; (2) the undefined term "pay" renders the agreement, at the very least, ambiguous because it could reasonably mean the time at which an account holder uses her debit card to make a purchase; and (3) even if the agreement clearly determines overdrafts at the time VyStar pays a merchant, an authorization hold obligates VyStar to apply the held funds exclusively to pay the initiating transaction.  As we will explain, we disagree.

## A

Washington contends that, for a signature-based debit card transaction, the agreement unambiguously determines overdrafts at the time of authorization.  She points to several contract provisions, but none of them support that reading.  Instead, the

agreement's plain language provides that overdrafts are determined at payment.

**i**

Washington relies on three contract provisions to support her argument that overdrafts are determined at authorization. First, Washington points to section 14.b.'s statement that "This service allows us to *authorize payment* . . . regardless of whether your account has sufficient funds" (emphasis added), and argues this fixes overdraft determinations at authorization rather than upon payment to the merchant.

Washington's argument on this point is entirely conclusory. In just two sentences, she asserts that "[t]he *only* reasonable interpretation of this provision is that overdrafts are determined at the time of authorization, not days later at settlement." She does not explain how or why that is the only interpretation. Indeed, she offers no analysis of the language at all. A conclusory argument cannot demonstrate error on appeal. *Wells v. State*, 807 So. 2d 132, 136 (Fla. 3d DCA 2002) ("On this issue, the defendant's appellate argument is entirely conclusory, and does not carry the defendant's burden of making error appear.").

In any event, Washington would fare no better on the merits. When read in its entirety, section 14.b. merely informs the account holder that, without the Courtesy Pay program, VyStar may not "authorize payment" or "authorize and pay" a transaction if it would result in the account having insufficient funds. Stated another way, this section governs eligibility for VyStar to authorize transactions that would otherwise be declined (subject to opt-in), and is silent on when overdraft fees are determined. The agreement addresses the timing of overdraft determinations elsewhere—in sections 14.c. and 14.d. as we describe below.

Moreover, the phrases "authorize and pay" and "authorize payment" do not mean that the authorization and payment stages of a signature-based transaction are one and the same. Instead, they recognize two distinct acts—authorization and subsequent

9

payment.[1]  At most, these phrases indicate that once a signature-based transaction is authorized, VyStar must later make payment upon the merchant's payment request.

In short, section 14.b. does not equate authorization with payment.  Nor does it establish when an overdraft is determined.

Second, Washington relies on section 14.c.'s statement that "holds placed on your account may reduce your available balance and cause your account to become overdrawn." Washington claims this language means overdrafts are determined at authorization because a hold occurs when an authorization request is approved (and before VyStar pays a merchant).[2]  She further reasons that if an authorization hold can "cause" an overdraft, then overdrafts must be determined at authorization.

But 14.c. does not state that overdrafts are determined when an authorization hold is approved.  And while it is true that a hold can lead to an overdraft—14.c. does not say that a hold will be the only or immediate cause.

Rather, that section informs the account holder that the available balance determines "whether there are sufficient funds in [the] account to pay items."  The clause Washington relies upon simply explains why an account may be overdrawn when an item is later paid: pending transactions and holds reduce the available balance.  In other words, "cause" in section 14.c. is not temporal—it identifies a factor that can lead to an overdraft when an item is paid.

An example should illustrate the point.  When an account holder presents a debit card to a hotel at check-in, the hotel might

---

[1] At oral argument, Washington's counsel conceded that the phrase "authorize payment" refers to the authorization stage of a transaction.  That makes sense given the parties agree that authorizing a signature-based transaction is a commitment to later pay it.

[2] Ironically, this argument necessarily acknowledges that authorization and payment are separate and distinct.

10

submit an authorization request (resulting in a hold) in an amount substantially greater than the expected charge for the room, perhaps to cover incidentals or damage to the property. That authorization results in a hold, which immediately reduces the account holder's available balance.

If the hold reduces the available balance into the negative, and the account holder thereafter makes even a modest PIN-based debit card purchase (which, as the reader will recall, is generally transmitted to VyStar for payment immediately), the account holder will incur an overdraft fee for the PIN-based transaction. This is because the account does not have a sufficient available balance to pay the PIN-based transaction amount.

In this scenario, the overdraft is not caused by the account holder's spending. Rather, it is the hotel's authorization request in an amount greater than the room rate that is responsible for driving down the account's available balance. Were it not for the hotel's authorization request, the account would not be overdrawn by the PIN-based transaction at all. Thus, section 14.c. merely recognizes that, in this way, a hold can reduce the available balance and set the stage for a later transaction to overdraw the account when it posts.

Third, Washington interprets section 1.b. of the electronic funds agreement to mean that overdrafts are determined at the time that a transaction is authorized. That provision recognizes that an account holder can "initiate a transaction that overdraws [her] account." Based on this language, Washington argues that account holders initiate transactions when they use their debit card at the point of sale. Therefore, says Washington, overdrafts occur at authorization and not at payment to a merchant.

That inference does not follow from the text. Indeed, in every example the parties have offered, a transaction is initiated before an overdraft occurs—but that does not tell us whether the overdraft is determined at the moment the transaction is initiated or later when the merchant is paid. As with many of Washington's arguments, she fails to acknowledge that the timing of an overdraft determination can (and according to the plain language of this agreement does) differ from the time at which she presents

11

her card to a merchant. The word "initiate" in section 1.b. of the electronic funds agreement merely describes the account holder's act of starting a transaction—it does not speak to whether an overdraft determination is made immediately upon initiation of the transaction or later at payment.

**ii**

While none of these contract provisions establish that overdrafts are determined at authorization, other provisions affirmatively provide that overdrafts are determined upon VyStar's payment to a merchant. For instance, section 14.a. states "if we exercise . . . our discretion *to pay such items* that result in an insufficiency of funds in your account. . . .[y]our account may be subject to a charge for each item." (emphasis added). The same section further provides "[i]f *we pay these items* . . . you agree to pay the insufficient amount, including the fee assessed by us, in accordance with our standard overdraft services." (emphasis added). Based on the plain language of the agreement, overdrafts are triggered by VyStar paying an item—and not at authorization.

Moreover, Washington's argument is dubious because it would inevitably lead to unexpected, irrational, and incongruous results for some transactions. As we have explained, an authorization hold can differ substantially from the merchant's subsequent payment request. The agreement expressly warns of this possibility:

> [I]f you use your debit card at a restaurant, a hold will be placed in an amount equal to the bill presented to you; but when the transaction posts, it will include any tip that you may have added to the bill.

Applying Washington's interpretation of the agreement, an account holder would incur an overdraft fee even when they have not made a purchase that overdraws their account. Consider two common examples. An account holder with an available balance of $200 reserves a $150 hotel room, but at check-in the hotel makes a $300 authorization request. Under Washington's view, the $300 hold alone will trigger an overdraft fee, even though the account

12

holder's actual purchase was well within the available balance and the account is never actually overdrawn.

Or perhaps an account holder's weekly purchase at the gas station will drive the point home. In this scenario, the account holder has an available balance of $90. Knowing this, she purchases only $80 in gasoline. But like the hotel, the gas station requests authorization for $100.

Again, Washington's reading would permit an overdraft fee in these situations even though the purchase did not exceed the available balance and even though VyStar never paid the amount of the (inflated) authorization hold. Based on a fair reading of the entire agreement, and contrary to the conflicted and strained interpretation advanced by Washington, we find nothing in the agreement's language to justify an overdraft fee when a merchant makes an authorization request well-above the transaction amount. Rather, the agreement contemplates an overdraft determination only at the time of payment.

**B**

Next, Washington contends the agreement is, at the very least, ambiguous because an account holder might read the undefined word "pay" to mean the moment when the account holder "pays the merchant at authorization." We are not persuaded for two reasons. First, this argument is inadequately briefed. Second, even if considered on the merits, the agreement's surrounding provisions and overall context render Washington's interpretation untenable.

**i**

Washington has not sufficiently briefed her argument that the agreement is ambiguous. This court's precedent makes clear that there are two types of contractual ambiguities—patent and latent. Our court is not alone. Both our supreme court and the United States Supreme Court have also long recognized this distinction. *See Bradley v. Washington, A. & G. Steam-Packet Co.*, 38 U.S. 89, 97 (1839); *Carson v. Palmer*, 190 So. 720, 722 (Fla. 1939).

13

A patent ambiguity appears on the face of the agreement, and importantly, parol evidence is generally not admissible to explain a patent ambiguity because that would permit the court to rewrite the contract. *See Davis v. Davis*, 390 So. 3d 1251, 1258 (Fla. 5th DCA 2024); *Life Care Ponte Vedra, Inc. v. H.K. Wu*, 162 So. 3d 188, 192 n.4 (Fla. 5th DCA 2015); *Beach St. Bikes, Inc. v. Bourgett's Bike Works, Inc.*, 900 So. 2d 697, 701 (Fla. 5th DCA 2005). A latent ambiguity, on the other hand, "exists where the language of an agreement is facially clear but an extrinsic fact or extraneous circumstance creates a need for interpretation or reveals an insufficiency in the contract or a failure to specify the rights or duties of the parties in certain situations." *Taylor v. Taylor*, 183 So. 3d 1121, 1122 (Fla. 5th DCA 2015).

Although latent ambiguities can be resolved by the trier of fact through the use of extrinsic evidence, Florida's courts have, using various legal remedies, generally resolved patent ambiguities as a matter of law.[3] *See Schwartz v. Greico*, 901 So. 2d 297, 299 (Fla. 2d DCA 2005) (recognizing that "if the ambiguity is patent, then the trial court was not required to look beyond the pleadings (and the attached Settlement Agreement) to enter judgment as a matter of law"). For example, at times, courts have concluded that a patently ambiguous provision was simply unenforceable. *Carson*,

---

[3] We recognize that there are limited exceptions permitting the use of parol evidence to resolve patent ambiguities. These exceptions include "identity, capacity, and the parties' relationship with one another." *See Fi-Evergreen Woods, LLC v. Robinson*, 135 So. 3d 331, 336 (Fla. 5th DCA 2013); *see also Nationstar Mortg. Co. v. Levine*, 216 So. 3d 711, 716 (Fla. 4th DCA 2017) (reversing summary judgment because extrinsic evidence was needed to answer the factual question concerning the parties' relationship with one another—whether a party was a borrower or non-borrower).

14

190 So. at 722 (patent ambiguity in a deed resulted in the deed being declared "void for uncertainty"); *Davis*, 390 So. 3d at 1258 (opining that the patently ambiguous provision was unenforceable). Still, in at least one situation, the Florida Supreme Court applied a rule of construction to resolve a patent ambiguity. *See DaCosta v. Gen. Guar. Ins. Co. of Fla.*, 226 So. 2d 104, 107 (Fla. 1969) (resolving patent ambiguity in insurance agreement).

We decline to decide these issues because they are not briefed. In her initial brief, Washington merely alleges that there is an ambiguity in the agreement and that a question of fact therefore precludes dismissal. She offers no argument concerning the type of ambiguity or what extrinsic fact might render the alleged ambiguity latent. If the ambiguity is patent, she does not brief whether any exceptions to the prohibition on extrinsic evidence apply or how to resolve the ambiguity if extrinsic evidence is not admissible.

In short, Washington's argument is woefully incomplete, and we will not make the arguments for her. *See Lynn v. City of Ft. Lauderdale,* 81 So. 2d 511, 513 (Fla. 1955) ("It is elementary that when a decree of the trial court is brought here on appeal the duty rests upon the appealing party to make error clearly appear. An appellant does not discharge this duty by merely posing a question with an accompanying assertion that it was improperly answered in the court below and then dumping the matter into the lap of the appellate court for decision. Under such circumstances it must be held, as we now hold here, that we are under no duty to answer the question." (citation omitted)); *Morelli v. Bordelon*, 394 So. 3d 1261, 1262 (Fla. 5th DCA 2024).

**ii**

Even if we were to reach the merits, the agreement is not ambiguous. First, Washington asserts that "pay" means the time at which she presents her debit card to a merchant because the agreement "links" authorization and payment. To support her argument, Washington points to language in section 14.a., recognizing that VyStar must, at some point, make a payment decision for each transaction. That provision states, in relevant

15

part, that VyStar "may return the item or pay it," that VyStar has "discretion to pay such items that result in an insufficiency of funds," and that "[y]our account may be subject to a charge for each item regardless of whether we pay or return the item." According to Washington, "pay" must refer to the time at which she presents her card to a merchant because, for signature-based debit-card transactions, that is when VyStar decides whether to "pay or return" the transaction. We disagree.

The text of the agreement does not "link" authorization and payment—at least not as Washington suggests. In this context, "return" means to reject a transaction. Once again, Washington seems to assume that VyStar's approval decision at the point of sale and VyStar's payment to the merchant at settlement must occur simultaneously or that they are substantively the same event.

Washington assumes too much. Nothing in the text collapses authorization and payment into a single, simultaneous act or joins them together in substance. For signature-based transactions, VyStar will often authorize or reject a transaction when Washington presents her card to make her purchase, and if authorized, VyStar will then pay the merchant later at settlement. While authorizing a transaction means VyStar has made a payment decision, the fact that the actual payment can be separated in time from the payment decision means that section 14.a.'s reference to both concepts does not tell us when an overdraft determination is made.[4]

### iii

While the provisions Washington relies on do not aid her cause, other provisions of the agreement plainly establish that "pay" means the time at which VyStar pays a merchant. In fact, section 14.a. repeatedly uses the word "pay" to describe VyStar's act of making payment rather than Washington's act of initiating a transaction by presenting her card to a merchant. For instance,

---

[4] We further explain the substantive difference between authorization and payment in section Biii.

16

14.a. provides that "*we* may return the item or pay it," that "*we* exercise . . . *our* discretion to pay such items," and that "*your* account may be subject to a charge for each item regardless of whether *we* pay or return the item." (emphasis added). It then continues: "If *we* pay these items . . . you agree to pay the insufficient amount."[5] (emphasis added). Given both the context and the agreement's express terms, "we" and "our" unmistakably refer to VyStar.[6]

The rest of section 14 reinforces our interpretation of the agreement. When read together, 14.c., 14.d., and 14.e. make it clear that processing, paying, and posting a transaction are all part and parcel of the settlement phase of a transaction. We know that "payments" are "posted" at settlement because section 14.c. tells us that is how an account holder's *actual balance* is calculated: "[y]our actual balance reflects . . . payment transactions that have been posted to your account." Of course, authorization cannot be synonymous with the word "post" because 14.c. describes an authorization hold as "not yet posted."

Section 14.d. confirms that "payment" and "posting" happen simultaneously: "payment requests are received in real time throughout the day and are posted to your account when they are received." And, consistent with 14.c., section 14.d. reiterates that an authorization hold is separated from posting a transaction: "if you use your debit card at a restaurant, a hold will be placed in an amount equal to the bill presented to you; *but when the transaction posts*, it will include any tip that you may have added to the bill." (emphasis added). Section 14.d. further distinguishes between authorization and payment, as to both timing and substance, by explaining that, if a transaction is authorized, "[t]he transaction is

---

[5] The few times the agreement uses the word pay to refer to the time when Washington presents her card to a merchant at the point-of-sale, the surrounding language clearly establishes that specific meaning.

[6] The agreement provides "[t]he words 'we,' 'us,' and 'our' mean the Credit Union."

17

*subsequently* processed by the merchant and *submitted to us for payment*." (emphasis added).

Lastly, section 14.e. ties the words "process," "pay," and "post" to the settlement phase of a transaction. For instance, we know that "processing" and "posting" a transaction could not refer to authorization because 14.e. says that "[c]hecks, drafts, transactions, and other items will generally be processed and posted *after* ACH credits, mail deposits and ACH debits have been posted to your account." (emphasis added).

Yet we know from section 14.d. that VyStar does not even receive an ACH transaction (e.g. automatic bill payments) until it is sent by the Federal Reserve for payment. If signature-based debit card transactions are "processed and posted" only *after* these ACH payment transactions are received from the Federal Reserve—the words "process" and "posted" can only mean the time at which VyStar processes a payment at settlement.

Clearly then, for a signature-based transaction, the text dictates that authorization and payment are different as to both time and substance. One is the promise to pay (perhaps before the final amount is known), and the other is the actual transfer of funds for payment. The two events are not "linked" such that payment means when Washington presents her card to a merchant at authorization. Instead, the word "pay," as used in the agreement, refers to VyStar's payment to a merchant at settlement.

### iv

Washington relies on decisions in other courts as persuasive authority that the agreement is ambiguous, but they are either distinguishable or lack any real analysis of the text. For instance, Washington argues that *Precision Roofing of North Florida. Inc. v. CenterState Bank*, No. 3:20-cv-352-J-39JRK, 2021 WL 3036354, at *2 (M.D. Fla. Feb. 22, 2021) supports her interpretation of the agreement. But that case does not control the outcome here.

First, the contract language in *Precision Roofing* is different. In that case, the district court reasoned the word "honor" might be

synonymous with "authorize." The word "honor" does not appear in the agreement in this case.[7]

Second, the *Precision Roofing* court observed that it did not have other relevant "documents relating to Defendant's overdraft fee policy" available for analysis because they were not attached to the complaint. *Id.* at *2 n.2. In this case, however, there are a host of other relevant provisions in the agreement attached to the amended complaint—all of which give the contract context and meaning.

Washington also invites us to adopt the court's conclusion in *Merritt Island Woodwerx LLC v. Space Coast Credit Union*, No. 6:23-cv-1066-PGB-DCI, 2023 WL 8699470, at *8 (M.D. Fla. Dec. 15, 2023) that contract language similar to the agreement in this case was ambiguous. There is just one problem. That case offers no analysis to support its decision. The entirety of the court's reasoning on the issue consists of a single sentence:

> The MSA can be read to only allow overdraft fees when Plaintiffs initiate and "consent" to Space Coast authorizing a withdrawal request that overdraws the account.

This conclusory statement is simply not persuasive. It fails to reveal the basis for the court's conclusion, making it impossible for us to test the result. Further, *Woodwerx* considers a single provision of the contract and fails to grapple with the text's other relevant provisions. To the extent *Woodwerx* finds ambiguity from

---

[7] Washington's reliance on *Roberts v. Capital One, N.A.*, 719 F. App'x 33 (2d Cir. 2017), is unavailing for the same reason. In *Roberts*, the court concluded that the contract's explanation of an overdraft as when the bank "*elect*[*s*] to pay checks" could mean that overdrafts are determined at authorization. *Id.* at 35 (emphasis added). No such language tying an overdraft determination to the time of authorization appears in the agreement before us. Here, the unambiguous language of the agreement determines overdrafts at the time VyStar makes payment.

a single clause, that approach conflicts with Florida law requiring courts to read the entire instrument and give meaning to all of its provisions.

## C

For her final argument, Washington asserts that the agreement's reference to an authorization hold "can be read to mean a debit card transaction authorized on sufficient funds cannot overdraw the account at settlement." In other words, she contends that the amount of funds on hold must be reserved to settle the originating transaction. She concedes the agreement does not expressly state any such requirement but argues the word "hold" implies it. On that basis, Washington claims the agreement is ambiguous. We disagree.

Washington puts more weight on the word "hold" than the language of the agreement can bear, and we cannot expand the contract's terms. Florida law is well-settled that "courts cannot rewrite contracts" or add terms to the text. *Saha v. Aetna Cas. & Sur. Co.*, 427 So. 2d 316, 317 (Fla. 5th DCA 1983); *see also Home Dev. Co. of St. Petersburg v. Bursani*, 178 So. 2d 113, 114 (Fla. 1965) (observing the "universal rule . . . that a court is not authorized to rewrite a contract of the parties"); *19650 NE 18th Ave. LLC v. Presidential Ests. Homeowners Ass'n, Inc.*, 103 So. 3d 191, 194 (Fla. 3d DCA 2012) ("The language of the covenant gives no indication that failure to follow its terms would result in the forfeiture of development rights."); *Corwin v. Cristal Mizner's Pres. Ltd. P'ship*, 812 So. 2d 534, 536 (Fla. 4th DCA 2002) ("Nowhere in the agreement was there any provision that Corwin could not sign a separate release with one of the non-party subcontractors.").

As Washington admits, nothing in the agreement states that an authorization hold sequesters funds, insulates them from intervening transactions, or requires that the held amount be applied exclusively to the originating transaction. The agreement merely provides that a hold reduces the available balance (making the held funds unavailable to Washington) while the transaction remains "not yet posted."

But reducing the available balance is a far cry from further guaranteeing that, if the account holder overdraws her account with subsequent purchases, the held funds will be protected from these intervening transactions and applied *exclusively* to the transaction that initiated the hold. The duty to insulate held funds (for Washington's benefit) is substantively different than merely reducing the available balance. Florida law is clear—we have no authority to add a new obligation to the agreement, and we decline to do so here.

## V

In conclusion, given the agreement's plain language, including its context, we conclude that for purposes of a signature-based debit card transaction (1) authorization and payment are substantively different events that take place at different times; (2) overdraft determinations are made at the time VyStar pays a merchant; and (3) VyStar is not required to exclusively apply funds held pursuant to an authorization hold to the originating transaction.

AFFIRMED.

WALLIS and HARRIS, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

21